Good morning, Your Honors. May it please the Court. Thomas P. Riley for G and G Closed Circuit Events, LLC, the appellant in this matter. The primary substantive issue before the Court, and I'd like to also, if I may, reserve two minutes for rebuttal. Watch the clock, and I'll attempt to help you as well. Thank you, Your Honor. The primary substantive issue before this Court is whether the federal statutes under which G and G brought suit, Title 47 U.S.C. Section 605 and 553, reach violations that involve use of the Internet. And it is well established that an unambiguous statute may be applied to situations not expressly contemplated. Because Internet violations do fall within the ambit of 47 U.S.C. Section 605 and or 553, the District Court erred in granting summary judgment to Liu. So, I'm pretty ignorant technically, but I have a vague understanding that Internet communications information is transmitted either by satellite over a cable or by cell phone. There isn't, in fact, a separate Internet hose that's just dedicated to the Internet. So, shouldn't you have found out whether the Internet communication in this case, what was the means by which it got to the lounge? No, I don't believe so, Your Honor. There are a variety of methods in which to, of course, access the Internet. Well, so how does the Internet get to somebody's computer or screen? I mean, it's, how is that, those signals transmitted, in your view? Is there something beyond satellite, cable, or cell phone? There's DSL, the digital satellite technology. There's the cable modem technology. Cable. There's a few other types of technology that allow Internet transmission. Okay. So, do we- Wireline. I mean, the bottom line is, we have your client, and then we have the hookah lounge over here, right? What evidence do you have as to how your exclusive fight rights were either transmitted or received by the hookah lounge? Well, they actually admit how they got it. They got it through Flips Media, Your Honor. Great. Flips Media appears nowhere in this case. Who is Flips Media? Flips Media is a digital media provider. And does your client have a contract or license to Flips Media? No, my client has the license with the promoter, and the promoter also has the license with Flips Media. And the way it works, Your Honor, is they split the rights. So, the way it works in sports promotion here domestically is that the promoter will put on the live event, and then there will be a division of the licensing rights. So, the promoter, no matter who it is, whether it's top-ranked or it's Golden Boy or it's the UFC that devises this production, is going to license this event worldwide. And here in the U.S., the platform, the big platform, is the pay-per-view platform. So, on the residential side, the promoters go to the programming providers. In the old days, that was the cable companies, and then it became the satellite programming providers like DirecTV and Dish Network. And nowadays, it's companies like Flip Media and the other streaming sites that provide the residential distribution. So, the fight itself goes to Flips Media how? Does it go by cable? Does it go by satellite? It depends on the event, Your Honor. They'll put them up. But we don't have anything in the record on that. Well, it goes up on satellite. I believe it's in Mr. Ghilardi's. Where do we see that? I believe it's in the underlying opposition to the defendant's summary judgment. Mr. Ghilardi testifies that the event in question, the Gennady Golovkin-Canelo-Alvarez fight on September 15, 2018, was uplinked to satellite. And back to the court's question. What happens on the licensing side, Your Honor, is that the promoters do the distribution worldwide. Here in the U.S., it goes to the different programming providers, streaming, satellite, cable. And then on the closed-circuit side, the parlance is closed-circuit. The commercial licensing side, the companies come into the marketplace and bid. That's what G&G did. So, did Flips get the satellite communication under a license? Yes, Your Honor. So, there's nothing. So, Flips didn't do anything improper. No, Flips isn't in this case. As they got the information. No, Flips did everything proper. And then Flips gives this little piece of paper that says, purchase details, ticket to watch the Golden Boys fight, $84.99. Correct. That's a residential license fee, Your Honor. That's for homeowners. But how do we know that? That's all it says, is it says a price. And it says, it's got a piece of paper that says there's a ticket. That's typical with this stream. Well, you know what? That's the problem. All this may be typical and standard. None of this is in the record. But the case isn't about the claim. G&G has no claim against Flips. Well, but, I understand that. But in order to trace how the program was either downloaded or received by the hookah lounge, they got it from Flips. They got it from Flips. And do we know how Flips sent it? Well, Flips puts it up, the way it is, is the promoter. But where in the record do we know anything about how Flips, whether this, how do we know that this is a residential license? Because they only had the rights to the residential license. But where does that in the record? Well, it's, okay. It's not. I believe it is in the record, Your Honor. Where? It's, I believe, if you go back through the district court record. We did. Okay. We've gone through the record, and the problem is there isn't much of a record. And you were given an opportunity to expand the record, but declined to do that. So that's why I'm left with not much. Okay. I'm a little in the dark on that, Your Honor. Well, that leaves us more in the dark. The case is about the applicability of the Internet to whether or not. . . No, it's not about the Internet. What does the court believe the issue is here today? Whether Flips had the rights? The question is whether there is a claim under Section 553 or 605 against the hookah lounge. That's the question, right? Agreed. Okay. So that boils down to, Your Honor, on the applicability of these telecommunications statutes to Internet-based transmission of the events that the clients have the right to. Okay. So what in the record directly goes to whether or not Internet transmission is covered by the statute? Well, that's the open question, Your Honor. That's why we're here today. No, but normally what you would do is you would set up. . . We know what, you know, as Judge Acuda appropriately points out, the Internet is not a thing. The Internet, as we know, is this interconnected, et cetera, et cetera, what the Supreme Court said. But how things are transmitted now, as you've pointed out, which is through wire, cable satellite, modem, et cetera, none of that is in the record to determine what falls within these definitions. So normally you would have either an expert or a client who explains all of that so the court can make a determination as to whether it fits in the statute. Okay. Well, I think that's. . . but that's the issue. The defendants admit. . . No, wait. It's not an issue. It's a question of proof. So I'm not sure how we can unscramble this egg when all we have is a little piece of paper that says Hookah Lounge purchased the right to watch the game. It was a fight. A fight, I understand. It was a fight. They admittedly streamed the fight. Yes. Okay. They streamed the fight through Flips Media, which now runs the Fight TV app, Combat Sport app, streaming app, exclusively for non-commercial, non-public exhibition. And where is that in the record? I believe throughout. . . we hit on that in the summary judgment documents, Your Honor, both plaintiff and the defendant. You don't have a citation for it. I don't have it here today because I was going to talk about the application of the law and why it does apply to this type of exhibition of this type of delivered content. But when you say. . . go ahead. No, I was just going to ask. . . the nature of the question is what is the nature of the technology that you say makes Internet transmission the same as cable and satellite? I'm not saying it's the same, Your Honor. What I'm saying is the breadth of the statutes, if you go through our briefing, and I'd like to go over it, it reaches the unambiguous statutes. It's a two-step process. So it's an unambiguous statute. Both the appellant and the appellee agree there. Judge Keller said so. We said so. But the next step of the analysis is taking it a step further, and that is that to have an expansive view of the unambiguous statutes, you have to go and realize that it applies to technologies that did not apply at the time that those statutes were constructed. Doesn't the Internet use the same systems as are indicated in these statutes? They use satellite and cable. No, they don't, Your Honor. And that's where the tire hits the road on these.  That's obtained through satellite, cable, or other means of transmission. So the question is, let me just explain where my problem is, and maybe you can eliminate it. I read the statute. And let me just say for talking purposes, I'll say it could cover technologies that might not have been in existence. But they still have to fall under these various terms. And it's not clear to me from the evidence in the record that I can even make that determination. Well, I would agree with the Court that ultimately, and the opinions, and they're all throughout the briefing of the different cases, if you look at the different cases, people either have DSL satellite Internet technology to get signal or they have cable modems to get signal. But what the courts have looked at is they say the Internet is different than pure cable and pure satellite. And the problem is certain judges, Judge Keller, who we took up on appeal in this case, and many others, is saying because it's Internet and it's not old-school cable or old-school satellite, these statutes don't apply. You haven't told us what it is. I mean, I'm happy to entertain that argument, but you can't just say as the cases have split, and that's where we get this what I think is a created Internet defense because it doesn't really exist, we have to know whether the technology can be encompassed by wire, cable, or satellite. And there's no evidence in this record to tell us that. Well, what some of the courts have done, Your Honor, Judge Boone, for instance, okay, if you read the recent opinion from Judge Boone that was adopted, they said at the end of the day, you're going to have to prove whether it was a cable or satellite means of Internet, okay? It's going to have to come down one, you know, one path or the other. And you didn't do that. Well, here we didn't get that far because they said they streamed it, and I believe they said they had it. It was streamed off the phone, okay, so it obviously wasn't cable. It was coming right through the phone, I believe in this particular case. No, but some people have their phone, television, and everything else through an integrated provider that may well be a cable-type provider. Perhaps, Your Honor, but most people that have a phone are not telling you. See, that's the problem. You're arguing in the abstract, and we're talking about specifics. So, for example, why didn't you bring this case under the Wiretap Act, which talks about electronic communications? Well, because, Your Honor, that wasn't what was before the court at the lower level. No, that's not my question. Why didn't I sue? You picked out 605 and 553. Why didn't you sue, for example, under the Wiretap Act, which uses the phrase electronic communications? We've never sued under that. No, why? We just haven't, Your Honor, because the— Is it applicable? I don't believe it is applicable. Okay. We've always sued under 553 and 605. Why didn't you sue under the Copyright Act? Because I want to go into that, okay, because the defense spends a whole lot of time in their answering brief about copyright, and that's the red herring. It's not a copyright case. It's not a DCM case against a service provider or anything of the sort. No, it's not a Digital Millennium Copyright Act case, but if somebody takes a program to which you have copyright rights exclusive for certain markets or anything else, and then they use that without your permission, that's a potential copyright violation. Absolutely is. But you didn't—you could have sued—so you could have sued under copyright. Sometimes and sometimes not. It's not that easy. In this case, why not? In this case, because at the time of suit, we didn't have those rights, okay? And it's more important, Your Honor— You didn't have those rights. Okay. The clients—let me explain. The clients, the distributors, have the rights. They have the contractual rights. They have the intellectual property rights. From the moment they contract with the promoters to secure those rights domestically for commercial licensing and distribution, it's actually the distributions done by the providers, but it's the licensing rights. They don't need the copyrights. That's not my question. I understand. What you keep dancing around are the statutes that may or may not apply. My question is, G&G, according to what's been represented here, has all the exclusive rights, including copyright rights, correct? It's a partial right, Your Honor. Partial. The promoter holds the copy—so it's a limited copyright assignment. Right. Okay. Would it permit you to sue for infringement of that limited— In copyright. In copyright, but you didn't. We didn't, and we shouldn't have to, and let me explain why. These companies, like my clients, pay millions of dollars oftentimes for the distribution rights. They have intellectual property rights that the courts have upheld for three decades, and we have sued successfully in 553 and 605 for the violation of those rights. The promoters still maintain, as the promoter, the paramount party that put the show on, pays the fighters, et cetera, they have the copyrights. Okay. These clients still have their intellectual property rights, and what this case is about, and the recent cases by the district court judges have found that these companies are aggrieved by this method by which people are now using the content, bypassing their commercial licensing rights, and showing these events unlawfully, and I have Judge Keller— Well, that doesn't answer my question at all, because that would, in fact, be a copyright violation, correct? It's only copyright violation when they are the—they have the copyrights to begin with, like Zufa did. And you have license— A limited copyright assignment, but it should never have to get that far, Your Honor. The clients shouldn't have to sue in copyright. I'm not going to argue with you anymore because you're not really understanding this constellation of possible claims. You have staked your claim on 605 and 553, right? And so then what we have to figure out is whether this little bar or restaurant or lounge, I guess we'll call it, is in violation of those statutes, right? Correct. And all we know is that they streamed the program. What we've asked for in terms of relief is— No, no. Have they streamed the program? Yes, Your Honor, unlicensed. And it's not—and it was not licensed by you.  Okay. And—but do we know what their license was from FLIP? Eighty-five bucks? No, no. The terms of the license. Well, I can tell you what the terms of the license— No, but is it in the record? The bar owner's terms—we're not privy to their sublicense agreement when they buy the event? Well, the answer is no, then. We don't know. You didn't take FLIP Media— No, we didn't—I can tell you— No, no, you can't tell us. Is it in the record? That's what I keep coming back to. Okay. You didn't put anything in the record that helps us decide the case. I mean, I hear your argument, but I'm asking what's in the record. G&G has the rights to the event for the commercial exhibition. I think the disconnect, Your Honor, is the court wants us to provide the terms and conditions that are going to say between FLIPs and this end user, that they can use it for non-commercial residential exhibition, et cetera. That's in their sublicense agreement, just like everybody else that buys content at home. But we don't have that. But what you do have is you have in the record that from Mr. Ghilardi, the president of G&G, it's throughout the district court record, that they were not commercially licensed as required. Okay, we've—you know, that's in the record clearly. And that's what matters, that they were not commercially licensed. That's what this case is all about. And we've asked the court to come down and look at the applicability of 553 and 605 and say definitively that they apply to Internet platform delivery of this type of content. That's what this appeal is about. All right, I think we've got your argument in mind. One last question. When the district court gave you an opportunity to supplement the record, what is it that the district court was giving you an opportunity to provide that was missing? In this case? Yes. That you declined to take that opportunity. What was the court anticipating you would be submitting if you were going to submit some? I don't recall that, Your Honor, that there was some type of a request for supplemental briefing. I thought there was some indication that— Did you want to have any additional discovery or anything else? And you said, no, show goes on, let's have the summary judgment. Because that's all that matters. So the answer is you didn't take any advantage of doing anything more because you thought just by putting up the statute that's all you needed to do. No, it's not just the statute, Your Honor. I think we made the record with everything that we filed in opposition to the summary judgment motion, the underlying pleadings at the district court level. I think we've done a terrific job on our appellate briefing here, both on the opening brief and on the reply. We've gone through the legislative history. We've gone through everything that they put in in terms of the opposition to this brief. And let me say, and I'll save it for rebuttal, this is a very, very important case because it's about finally seeing, unlike what's said in their papers, there's no law on this, not in the Ninth Circuit or at the Supreme Court level. Okay? And this court has consistently taken unambiguous statutes in the Ninth Circuit, in Direct TV v. Webb, the U.S. case, the Department of Corrections v. Getsky, and the Barr case, and they have seen how these statutes that did not exist, this technology did not exist at the time, can be grown.  And that's what has to happen here. And you say that that can be determined without any further factual supplementation of the record? It's a finding that 553 and 605, Your Honor, apply generally. Well, even if it applied generally to the Internet, where's the intercept? Where's the evidence of intercept? You don't have to have intercept, Your Honor. That's Ninth Circuit. That's Direct TV v. Webb. That's the third sentence of that statute. I'm looking at 605, and I'm asking where is the intercept? You don't have to have intercept anymore. Is there an intercept? You don't have to have intercept. You know, if you would answer the question instead of arguing with yourself and me, it might be a little easier. Is there an intercept here? No, there's an unlawful exhibition, and that's what matters. All right. We'll hear from Lew's counsel. Thank you. Good morning, Your Honors. Trevor McCann for Defendant Appellee C.L. Lew.  I'll touch on one aspect, and that being the court raised the prospect of a DMCA violation, that is a copyright violation. It is in the record. I apologize that I'm unable to cite to it at the moment, but it is in the record that G&G owned copyright to this program. It was for a commercial copyright. It is in the licensing agreement. While G&G wants to make this case about two statutes and make them very broad, the appellee, Mr. Lew, we have argued that there are laws on the books to address, and I believe the court raised that issue as well. Of course, they don't have to sue under those laws. They can pick which claim they want to sue under, can't they? Yes, Your Honor. And they decided, well, we're going to forego that. We're going to go with basically 553 and 605. Indeed. Indeed. Right. So why isn't your client's conduct covered under those statutes? Well, let's start. Judge Keller determined that the statute is unambiguous. The statute was enacted in 1984. At that time, the Internet simply didn't exist. As we point out in our brief, Congress specifically stated, when discussing the Communications Act, several proceedings are now underway to determine the regulatory treatment of non-cable communication services over cable system. Those, I'm sorry, and it goes on to say, such as data transmission and private line voice services. It's our position that those data transmission and private line voice services encompass what is today's Internet. And because Congress specifically stated that those types of services were under consideration elsewhere, that Congress did not intend for those services to be encompassed in 553. Well, when I look at 553, it's fairly broad. It says no person shall intercept or receive a communication service offered over a cable system. So if I get my Internet over a cable system and somebody else taps into it, I guess would be the concern. Why wouldn't the language of that statute cover that? Cable system at the time meant cable television. I think the easiest way to put this is that in the recent years, let's say the past five years or so, TV commercials come out and they say, disconnect, unplug, or cut the cord.  And they're pointing you towards the Internet. Get your information via the Internet, not via Comcast's cable as it is traditionally known. So if Spectrum comes into my house and gives me television, Internet, phone, which is what they want to do, are you saying that the language in 553A1 wouldn't apply because Congress didn't understand that a cable system could provide all of these different services? I think when looked at vis-à-vis the DMCA, which is to say that to take advantage of the safe harbor in the DMCA, that the cable company is in the business of providing the Internet. So long as the Internet is involved, then a claim could be made on DMCA. So coming back to 553, again, Congress has stated that there are other services that this wire here can bring to you. But those services should be addressed under different regulations, not this regulation. So is it your position that if somebody could bring a claim under the DMCA, they're precluded from bringing a claim under 553? Is that your position? No, that's not my position. The position is if G&G wants to bring a claim for theft of cable, it can do so. There are providers that bring services into the lounge via television cable. That is pay-per-view that Mr. Riley mentioned. However, there are different services. Those are Internet services. Those bring streaming video to totally different services. Yes, they come through the same wire because there's a finite way of transmitting information in this world. So this refers to communication service that's offered over a cable system, which would seem to cover both of them. Why doesn't it? Because the cable system was that which was understood in 1984. It is the cable. What Comcast was using in 1984 was this association of all of these things. Your Honor, I don't know what these things are, but I know they weren't the Internet. Well, that's true. But cable system is defined as a set of closed transmission paths associated signal generation, service, reception, control, et cetera. So why couldn't what we have today fall under that? Because, as I pointed out, Congress intended those non-cable communication services provided over cable systems to be treated by other regulatory agencies, systems, laws, whatever it may be. Well, the fact that they're looking into application, that happens all the time. If you look at the FCC proceedings, there's a series of proceedings like does this apply to the Internet? Does this apply to this? Are we under the 1934 Communications Act? So the FCC is always looking to see what its jurisdiction is, but that doesn't mean it doesn't necessarily have jurisdiction, does it? Well, we're not saying that there's not a remedy, Your Honor. We're simply saying this isn't the remedy, and we're saying that Congress— Do we know, as to your client, we know that he signed up and bought through this piece of paper from FLPS, right? Yes, Your Honor. And he says in his declaration that he got the fight or the program via streaming. Yes, Your Honor. What else do we know? Do we know what kind of streaming? Do we know what service? Do we know— It was through Spectrum Internet Business, I believe, was his. I saw some Time Warner cable in the record. Let me make clear, Your Honors, that I have two cases on appeal at this very moment, Mr. Liu and Mr. Rito. I know that there is Spectrum and Time Warner, and I apologize that I'm unable to tell you which either used. But I will make this point, that one can have Internet without cable. One can have cable without Internet. They are mutually exclusive, but they can be ordered at the same time as well. And what we are saying is that— And, of course, where's that in the record? Oh, that they can be ordered at different times? Yes. Your Honor, that was not a fact. I mean, I think the difficulty we're having is there's no facts here. You know, I mean, I hear you. We know from ads. We know from what we subscribe to, but we're not supposed to go on that. We're supposed to look at, you know, what does the record tell us? So one thing that your colleague says is that whatever your client got, it was for a noncommercial license. Do we know that one way or the other from the record? That is something that Mr. Riley decided not to address at the lower court. Okay. Well, you say that you're relying on language of Congress to say that some of these issues are going to be dealt with separately in the future. Why is that? But you rely upon that as some sort of exclusion language that means that it's excluded from coverage here. Why is that necessarily so? Simply because they anticipate that there are new technologies coming and there may be certain things unique to that technology that require further legislation. Why is that in some indication that what is already on the books doesn't cover? Because Congress specifically stated that there is inquiry into these other technologies. But Congress didn't specifically say they're not covered by this act. You're referring to legislative history, right? You're not saying there's anything in the statute that says that. No, but I am referring to the legislative history. But to say for Congress to go on record and say that there are several proceedings now underway to determine regulatory treatment of non-cable communications over a cable system, in our view, that is Congress saying we're going to figure that out. Nothing applies at this point until we do that. Because it didn't exist, Your Honor. I guess the bottom line is what is the logic of that? What is the logic of saying that the new technology, even if it didn't exist when the statute was written, somehow should be excluded because we don't really intend for it to cover that? What's the logic behind that? Why is this different? If the technology doesn't exist, how are we to legislate for it? Well, you know, if people say, well, this statute covers cars, and at the time there were no electric cars, it doesn't mean when there were electric cars that it doesn't cover electric cars, just because the technology didn't exist at the time. True. I think that that example misses the mark, though, because a car is a car. It runs on four wheels. Well, that's what we're trying to understand. That's the whole point. No, I understand. Is the Internet transmission, wire or wireless transmission, something that didn't exist? I mean, I don't know why you say that this, you carve out this exception and say, yeah, you can, as they say, you can rip me off by Internet, but you can't rip me off by cable. What's the logic of that? When Congress recognizes an issue, it addresses it. It didn't recognize the issue at the time because the technology didn't exist. In 1993, Congress recognized that there was an issue with the Internet, and Congress said, we have to do something about that. And with respect to this particular issue, the streaming video over the Internet, Congress said to itself, we need to make legislation that is the DMCA to address this. In 1996, after they had gone through everything, Congress said, this must be done. Now, think about this, that Congress knows, when Congress legislates, it is presumed that Congress knows the laws that are on the books. So Congress wouldn't need to legislate in another area if it were already legislated. It didn't exist at the time. It existed or it came into existence. Congress said, we need to address that, and they did. Thank you. I think we have your point in mind. Thank you, Your Honors.  Mr. Riley, I'm going to give you two minutes for rebuttal, but before I do that, I want to tell you that I went back and the district court had the same issue we did, and the district court said that it was, maybe you don't remember this, but it said it was reopening Discovery for 60 days to determine the method of transmission of the program at issue, and then ordered the parties to participate in Meaningful Discovery and file anything else. And following that, G&G said it declined to supplement the record. So you had the opportunity and declined it, and that just seems to be where the record sits on Discovery. Okay. Because they streamed it off Flip, Your Honor. It was a streaming. They streamed it off the streaming app, and they cast it onto the phones inside the Wave Hookah Lounge. But I really don't think it – I know the court has pivoted on that. I don't think it matters here, but I want to just hit on a few points. Okay. Counsel is dead wrong. Okay. We don't have to wait for Congress to come up with something down the line. Okay. This is a case about statutory interpretation of an unambiguous statute and whether it could apply. The DMCA has no bearing on this type of conduct. This is about service provider immunity and giving them a layer of insulation. That's what the DMCA statute's all about. It wasn't briefed at the summary judgment level. It shouldn't even be considered by the court at this level. Okay. The idea that we have to stop and consider technology that was only in existence at the time the statute was created is dead wrong. This court, the Ninth Circuit, found that in the Webb case that 605 was violated. That didn't exist at the time 605 was created and Webb was ruled on, along with these other cases that are in our briefing. The issue is whether or not these statutes grow to address this immense problem. It's all through the briefing, but back here we point to it in the congressional record. The defendant brought up the legislative history. They opened that door on the answering brief and we hit it hard on our reply brief and we went through the congressional record and talked about all these congressmen and what they foresaw the change of this technology to be. I invite the court to read that. They saw what exactly, that these things were going to change and they're going to need to be regulated and these statutes need to grow. It's consistent with the law to address this type of behavior, this type of unlawful behavior. You can't rip off through the internet and wait 20 years for Congress to come up with a statute when all you need to do is see that the law grows consistent with the case law to be applicable to this type of conduct. And we've touched on that in all the briefing. You've got a very, very important, the piracy statutes have a broad expanse and the courts that have ruled on this, take a look at what the district judges have done. They've seen it for what it is. This is not the modern-day theft and they're not going to let the distributors like G&G and the other family businesses get decimated. They have the rights under 553 and 605 and they need to be able to protect those rights, protect their customers, proceed in the court and see, unlike Judge Keller, that these claims are going to be considered and that this type of conduct, using this type of technology, that's consistent with the growth of the statute. Thank you. You've well extended your two minutes now. Applies. I think we've got your argument in mind, as well as Mr. McCann's. So thank you. Thank you, Your Honor. Very interesting case. The case of G&G closed-circuit events v. Liu is submitted.
judges: McKEOWN, IKUTA, Daniels